IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHARLIE F. HUDSON, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:05cv0004-VPM |
| | ) | [WO] |
| FEDERAL BUREAU OF PRISONS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER ON MOTION**

Pending before the court is the defendant's ["Bureau"] Motion for Summary Judgment (Doc. # 26)[1] of the plaintiff's ["Hudson"] claim of race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ["Title VII"], 42 U.S.C. § 2000e *et seq.*[2] Upon review of the parties' arguments, supporting memoranda of law, and evidentiary submissions, the court finds that the motion is due to be granted.

**II.    SUMMARY JUDGMENT STANDARD**

Summary judgment can be entered on a claim only if it is shown "that there is no

---

[1] The motion was originally filed as a motion to dismiss or, in the alternative, a motion for summary judgment, which the court later construed as a motion for summary judgment (Doc. # 29).

[2] Although Hudson's complaint invokes 42 U.S.C. § 1981(a), which prohibits race discrimination, neither party discusses this provision in the relevant submissions. This case involves a federal agency's internal operations, and, therefore, Hudson cannot maintain an action under section 1981. *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998) ("[A] plaintiff cannot maintain a § 1981 claim against a federal defendant acting under color of federal law."); *see also* 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.").

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Green v. Pittsburgh Plate & Glass Co.***, 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986)).

"A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id*. at 259. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[3] ***Adickes v. S.H. Kress & Co.***, 398 U.S. 144, 158 (1970); ***Mize v. Jefferson City Bd. of Educ.***, 93 F.3d

---

[3] The Supreme Court explained that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23 (1986) (citations omitted).

739, 742 (11th Cir. 1996). Notwithstanding this advantage, a nonmoving plaintiff bears the burden of coming forth with sufficient evidence on each element that must be proved.[4] *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990); *see Celotex Corp.*, 477 U.S. at 322-23. When faced with a properly supported motion for summary judgment, a plaintiff must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324. Although the evidence need not be in a form necessary for admission at trial, *id.*, unsupported, self-serving allegations are insufficient to oppose a motion for summary judgment. *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

### III.   FACTS

In January 2003, after 30 years of untarnished service, Hudson retired from the Bureau

---

[4] In a Title VII claim based on circumstantial evidence, "if on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, . . . [the court must] grant summary judgment [for the defendant]." *Earley*, 907 F.2d at 1080 (citations omitted). In *Earley*, the Court of Appeals further emphasized:

> "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;  there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.
> ***
> ["]If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted) (emphasis added); *accord* **Hudson v. Southern Ductile Casting Corp.**, 849 F.2d 1372, 1376 (11th Cir. 1988).

*Earley*, 907 F.2d at 1080-81.

as a supervisor of education ["SOE"] for the federal prison camp located in Montgomery, Alabama ["the Montgomery camp"] (Hudson Decl., Doc. # 31-2, p. 1). In that position, in which he began serving in 1998, Hudson, who is African-American, enjoyed the government pay grade commonly referred to as GS-11. *Id.* Hudson contends he should have been a GS-12, which would have resulted in a higher salary while working and a higher pension after retirement. The reason he was not, he contends, is because the Bureau discriminated against him. *Id.*

This lawsuit represents merely the most recent chapter in Hudson's quest to resolve this matter, which, the evidence suggests, began shortly after his acceptance of the position of SOE with a complaint to his supervisor, Willie Collins ["Collins"], then the warden at the Montgomery camp, which is part of the Bureau's Southeast Regional Office (Collins Decl., Doc. # 31-7, p. 1; Kirby Decl., Doc. # 27-10, p. 2). According to Collins, Hudson informed him that a white SOE at a prison camp in Bryan, Texas ["the Bryan camp"], which is part of the Bureau's South Central Regional Office was classified as a GS-12 (Collins Decl., Doc. # 31-7, p. 1).

After confirming this information, Collins recommended to his supervisor, Robert Matthews, then the director of the Southeast Regional Office, that the position be upgraded to a GS-12 (Collins Decl., Doc. # 31-7, p. 1). According to Collins, Matthews, in his presence, then immediately telephoned the Director of the Bureau, informing her of the disparity as well as the potential problems that may arise from the potential perception of racial bias (Collins Decl., Doc. # 31-7, p. 2).

4

Matthews then informed Collins that the problem would be addressed and that the "Bureau of Prisons Re-engineering program would make the necessary corrections to the Supervisor of Education position at FPC Montgomery and other related problems through out [sic] the Agency [sic]" (Collins Decl., Doc. # 31-7, p. 2).[5]  Collins relayed this information to Hudson and advised him to wait a year for a resolution. *Id.*

Hudson describes his efforts to upgrade the position somewhat more abstractly:

> At sometime [sic], approximately in 1998, I attempted to get a position upgrade, a promotion, to GS-12, through my wardens and other officials within the Bureau.  Each request was met with a denial based on various reasons.

(Hudson Decl., Doc. # 31-2, p. 1).

An excerpt of Hudson's deposition, which the Bureau submitted, indicates that Hudson also mentioned the disparity to Collins's successor, Ruth Yancey ["Yancey"], in 2002 (Doc. # 27-1, p. 8; Def's Ex. F, p. 4).  Hudson also stated his belief that Yancey forwarded his complaint to a second Southeast Regional Office director, Raymond Holt, who declined to upgrade his position (Doc. # 27-1, p. 8).[6]

---

[5] Although Collins's statement is replete with hearsay and speculation, the court assumes its admissibility solely for summary judgment purposes because the defendant has not challenged it on those or any other grounds.

[6] The Bureau cites to a portion of the deposition that was not provided to the court. Regardless, the court accepts the Bureau's interpretation of the evidence, which can only help Hudson, whose submissions do not mention and whose evidence does not relate to any requests for an upgrade other than his complaint to Collins.  Again, the court does not mean to suggest that Hudson's speculation would be admissible at trial.  The profound weakness of his case, which shall become clear, and his apparent insistence on pursuing this matter despite lacking evidence of wrongful discrimination, compels the court to ensure Hudson the benefit of every doubt.  Therefore, the court accepts his testimony as evidence that the events about which he speculates actually

Apparently assigning the disparity a systemic cause, in December 2002 Hudson filed a class action complaint with the Department of Justice in which he alleged "that the Agency's policy of basing employees' wages on the geographical location of the institution where they worked had a disparate impact, on [sic] those individuals age forty and older" (Def's Ex. C, Doc. # 27-5, p. 5; Doc. # 27-1, pp. 2-3; Def's Ex. A, Doc. # 27-3).[7] Class status was denied, and Hudson was permitted to pursue his cause individually (Def's Ex. A, Doc. # 27-3).

As the matter was being considered at the administrative level, Hudson's theory of the case changed. He amended his complaint to exclude age and add race as the basis for the perceived discrimination (Def's Ex. C, pp. 1-6). His claim was ultimately unsuccessful, and Hudson then filed this lawsuit alleging disparate pay resulting from discrimination on the basis of his race (Doc. # 1).

---

happened.

[7]Offering no legal support, Hudson challenges the Bureau's introduction of the opinions issued at the agency level as "not binding on this Court; therefore, it is not relevant or probative" (Doc. # 31-1). The question of relevance can be addressed without reference to the effect of the agency opinions on this court's review. Binding or not, the opinions provide relevant information that add to the court's and, therefore, the reader's understanding of the facts of the case. The court relies on these opinions for nothing more than factual filler and, therefore, offers no opinion as to their substantive value. It is sufficient to state that the opinions did not factor materially into this opinion.

## IV.   ANALYSIS

*A.   Disparate Treatment in General*

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1) (2000).

Ultimately, Hudson must point to evidence that, if believed, would allow a reasonable trier of fact to conclude that the Bureau treated him differently because he is African-American.  He may do so through the introduction of direct, circumstantial and/or statistical evidence.  *See, e.g.*, **Wilson v. B/E Aerospace, Inc.**, 376 F.3d 1079, 1085 (11th Cir. 2004); **Corbin v. Southland Int'l Trucks**, 25 F.3d 1545, 1548 (11th Cir. 1994).

Hudson points to no direct or statistical evidence supporting his claims, thus his case must be analyzed according to the familiar burden-shifting framework set forth in **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973).  Consequently, to survive summary judgment, he must first present a *prima facie* case, which generally means that he must demonstrate that he was a qualified member of a protected class and was treated differently than similarly situated persons outside his protected class.  **Wilson**, 376 F.3d at 1087.

Assuming he is successful, the burden shifts to the Bureau to "articulate a legitimate, nondiscriminatory" reason for its alleged actions.  **Wilson**, 376 F.3d at 1087.  If the Bureau succeeds, the burden shifts back to Hudson "to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination."  **Wilson**, 376 F.3d at 1087-88.

### B.   Prima Facie *Case*

Although the elements of a *prima face* case are not rigid, generally a plaintiff alleging disparate pay establishes a *prima facie* case by demonstrating "that [he] occupies a job similar to that of higher paid" persons not in the plaintiff's protected class.  **Ledbetter v. Goodyear**, 421 F.3d 1169, 1185 (11th Cir. 2005) (applying the standard in a sex discrimination case); *see also* **Mulhall v. Advance Sec., Inc.**, 19 F.3d 586, 598 (11th Cir. 1994) (noting that the standard of similarity of positions in Title VII cases is "relaxed").

The Bureau contends that Hudson has failed to present a *prima facie* case of race discrimination because he has failed to (1) demonstrate an adverse employment action and/or (2) point to an appropriate comparator (Doc. # 27, pp. 7-12).

#### 1.   Adverse Action

Assuming that Bureau personnel decided not to upgrade Hudson's position, the Bureau contends that the decisions did "not constitute an adverse employment action" because

> the plaintiff did not experience any change in his terms, conditions, or privileges of employment as a result of the fact that his position was not upgraded.  His grade level unaffected, the alleged denial of the upgrade did not preclude him from the opportunity to apply for positions at the institution that had a higher grade level.

(Doc. # 27-1, p. 9).

Ignoring for the moment the *prima facie* standard set forth above, which does not

8

require the plaintiff to demonstrate an "adverse action" *per se*, the Bureau's argument is illogical and, if accepted, would lead to the absurd result that Title VII would allow employers to ignore requests for pay raises made by employees in a protected class while granting such requests made by employees in the same position but not in the protected class so long as the employee in the protected class could apply for different positions that paid more. The only case to which the Bureau cites in support of its argument is factually inapposite. ***Davis v. Town of Lake Park, Fla.***, 245 F.3d 1232, 1239 (11th Cir. 2001) (addressing a Title VII claim based on negative "job performance memos placed in his personnel file and two instances where he was temporarily removed as the designated officer-in-charge").

While it is true that Title VII governs conduct, the relevant aspect of the Court of Appeals's *prima facie* standard is satisfied with evidence of a pay disparity between persons in similar jobs. ***Ledbetter***, 421 F.3d at 1179.[8] Nothing more adverse is required. Add to the

---

[8]The ***Ledbetter*** court explored this principle in depth when determining whether the plaintiff's charge of discrimination filed with the Equal Employment Opportunity Commission was timely:

> It is fundamental that for a Title VII plaintiff to prevail on any type of disparate treatment claim, he or she must point to some specific, conscious conduct that was tainted by the alleged improper consideration (be it "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1)). In a case in which the plaintiff complains of discriminatory pay, there are only two possible sources of such conduct: the decisions setting the plaintiff's salary level or pay rate, and the issuance of paychecks reflecting those decisions. Whether it is a pay-setting decision or the issuance of a confirming paycheck that is viewed as the operative act of discrimination, the act is, like "termination, failure to promote, denial of transfer, or refusal to hire,"

differential pay affirmative decisions not to eliminate the disparity, and the case is stronger still.[9]  *See id.*

The Bureau concedes that Davis is paid more; thus, this aspect of the standard is satisfied.

### 2.  Hudson's Comparator

The Bureau correctly contends that the position filled by Davis, the white person with whom Hudson attempts to compare himself, is not sufficiently similar to satisfy the *prima facie* requirements.[10]  In fact, this is the essence of the Bureau's entire defense, including its

---

> [*Nat'l RR Passenger Corp. v.*] *Morgan*, 536 U.S. [101,] 114 [(2002)], discrete in time, easy to identify, and – if done with the requisite intent –independently actionable.

*Ledbetter*, 421 F.3d at 1179 (holding that each paycheck issued during the relevant limitations period constituted an actionable act).

[9]The Bureau does not concede that a decision was ever made with respect to Hudson's pay grade and notes that he "does not pinpoint when, if ever, [he] was told that his position would not be upgraded" (Doc. # 35, p. 8). Again the Bureau's position lacks logic.  Hudson's awareness of a decision being made, or lack thereof, is not indicative of whether a decision was in fact made. Hudson and the Bureau both have provided evidence, discussed *supra*, that Hudson complained about the disparity, including the perceived racial undertones, and that persons with the ability to effect a change in that disparity were aware of Hudson's complaint.  The undisputed fact that the disparity nevertheless persisted at least until Hudson retired allows for an inference that decisions were made not to upgrade Hudson's position.  Of course, and it is worth emphasizing, it says *absolutely nothing* about the reasons underlying those decisions.

[10]Notably, Hudson does not compare himself with John P. Dunlap ["Dunlap"], an SOE at the federal prison camp in Pensacola, Florida, which is within the Bureau's Southeast Regional Office (Dulap Decl., Doc. # 34-2, p. 1).  Dunlap, who is white, was a GS-12 while working as an SOE at a federal correctional institute in Greenville, South Carolina, until 1995 when he was transferred to the Pensacola camp.  *Id.*  As a result of the transfer, his pay grade changed to GS-11 and remains GS-11 as of 2 March 2006.  *Id.*

legitimate, nondiscriminatory reason.

Although the court agrees that the distinctions between the responsibilities fulfilled by Hudson and Davis are not similar enough for Hudson to have stated a *prima facie* case and,[11] thus, the Bureau is entitled to summary judgment, in the interest of facilitating closure, the court will assume Hudson has satisfied the *prima facie* requirements. Therefore, to avoid repetition, the court discusses the relevant distinctions in the context of Hudson's ability to overcome the Bureau's legitimate nondiscriminatory reason.

### C.   *Legitimate Nondiscriminatory Reason*

Acknowledging the disparity between Hudson's pay and Davis's pay, the Bureau also explains it well.

Stated simply, the difference in pay was commensurate with the difference in responsibilities between the positions. According to the Bureau, the positions differed in three key ways (1) the SOE at the Bryan camp was responsible for oversight of the education program for the camp itself as well as the camp's federal "Intensive Confinement Center" ["ICC"], which the Montgomery camp lacks (Doc. # 27-1, pp. 10-11; Kirby Decl., Doc. # 27-10, ¶ 11);[12] (2) when the positions were most recently classified, the number of inmates

---

[11] Furthermore, Hudson provides no additional evidence that would give rise to an inference of discrimination.

[12] Hudson limits his comparison to the inmate population of the camps – though he fails to explain how that number is relevant – and ignores the number of inmates confined in the Bryan camp's ICC (Doc. # 31-1, p. 8).

11

enrolled in the programs offered at the Bryan camp exceeded the number enrolled at the Montgomery camp by 100 percent or more (Fowler Decl., Doc. # 27-12, ¶¶ 6-8);[13] and (3) the Bryan camp and ICC program offered more than twice as many courses as the program at the Montgomery camp.[14] *Id.*

Thus, the Bureau has satisfied its burden of articulating a legitimate, nondiscriminatory reason.

---

> According to the February 5, 2004 population report, the population at Bryan Federal Prison Camp was 785, while it was 860 at Montgomery Federal Prison Camp, and 838 at Eglin Federal Prison Camp. Also, according to the population report of January 29, 2004, the population at Bryan was 791 and 861 at Montgomery, and 830 at Eglin.

*Id.*

Although Hudson's numbers are correct with respect to the Montgomery and Eglin camps (the latter is not relevant to this case), Bryan's inmate population, including the population in the ICC, was actually 896 on 29 January 2004 and 890 on 5 February 2004 (Pl's Exs. B1, B2, Docs. ## 31-5, 31-6).

[13] According to Karen Fowler, a "Classification and Compensation Specialist" with the Bureau who in that position enjoys firsthand knowledge of the classification of both of the positions at issue, the evaluation statement on which the classification decision was based described the education program at the Bryan camp and ICC as having enrolled "approximately 400 students" whereas the form describing the education program at the Montgomery camp indicated enrollment of "between 100 and 200 inmates" (Fowler Decl., Doc. # 27-12, ¶¶ 6-8). Hudson does not challenge the student enrollment figures or offer any evidence contradicting Fowler's figures.

[14] Fowler stated that the Bryan camp and ICC combined offered "50 creditable courses" whereas the Montgomery camp offered only "between 10 and 20 creditable courses" (Fowler Decl., Doc. # 27-12, ¶¶ 6-8).

### D.     *Hudson's Rebuttal*

Hudson contends that the Bureau's reason is not worthy of belief, but he fails to adequately explain why, opting instead to offer unsupported legal conclusions (Doc. # 31-1, pp. 14-16).  More importantly, he fails to identify evidence that these differences were not the reasons for the disparity or the bases for the presumed decisions to maintain the disparity.

Hudson relies primarily on the generalized position descriptions for supervisors of education.[15]  Assuming *arguendo* that the position descriptions are binding on the Bureau, they do not aid Hudson because the position at the Bryan camp and ICC does not fit neatly within either the GS-11 or GS-12 position descriptions.  The key, and perhaps only, notable distinction between the relevant position descriptions is the type of facility to which a particular description applies.

The position description for the GS-11 supervisor of education notes that "[t]his

---

[15]He submitted additional evidence, including the evidence already discussed as well as affidavits from fellow Bureau employees addressing his age discrimination claims, which have no bearing on this case.  Among the more puzzling pieces Hudson provides are affidavits that actually strengthen the Bureau's stated rationale.

According to Alice Hernandez ["Hernandez"], as of 30 July 2004 a human resource specialist with the Bryan Camp (Doc. # 31-8), the SOE position at Bryan was upgraded from a GS-11 to a GS-12 "[b]ased on the fact that Mr. Davis retained responsibility for coordinating community service programs for the inmates at the ICC, including Brazos Beautiful, Adopt-A-Highway, Vocational Training Horticulture, Twin City Mission, Habitat for Humanity, the Texas Army National Guard, and the Sam Houston National Forest . . .."  (Doc. # 31-8, ¶ 10).

Moreover, Kathleen S. Guariglia ["Guariglia"], who was a human resource administrator for the Southeast Regional Office (Doc. # 31-15),  confirmed that a position's grade level is established in accordance with "the various programs, the number of inmates in the programs, the level of responsibility, the quality and quantity of the work . . ., [and] how many staff they supervise" (Doc. # 31-15, p. 2).

position is located in the Education Department at a Bureau of Prisons Federal Prison Camp" (Def's Ex. G, Doc. # 27-9, p. 5). On the other hand, the GS-12 "position is located in the Education Department at a Bureau of Prisons federal correctional institution, metropolitan correctional or detention center, federal detention or transportation center, or a major medical facility" (Def's Ex. G, Doc. # 27-9, p. 16).

Nowhere in either description is mentioned a federal prison camp with an ICC, which is "a program located at select federal prisons that is focused on personal development, self-control, and discipline" (Rivera Decl., Doc. # 27-11, ¶ 6).[16]

> Inmates who participate in the program complete an institution-based component and then serve the rest of their sentences in community-based programs. Eligible inmates who complete the institution-based component of the program and maintain adequate participation in the community-based component can be considered for a reduction in sentence.
>
> The ICC Education Program that fell within the purview of the Supervisor of Education's duties through the restructuring included community service programs and public work projects. The public work projects included programs such as Mental Health Mental Retardation, Texas Army National Guard, U.S. Forestry, Core of Engineers Program and Texas A & M Master Gardening. The additional responsibilities also involved oversight of an educational program for "boot camp" inmates and supervision of more staff.

*Id.* at ¶ 7.

Hudson has failed to refer the court to evidence that suggests that this distinction was

---

[16]At the time of her declaration, Linda Rivera was the "Regional Employee Services Administrator at the South Central Regional Office" and has "worked in the South Central Regional Office since June 1994" (Rivera Decl., Doc. # 27-11, ¶ 2).

immaterial or was otherwise false. Moreover he offers no evidence that the SOE position at the Montgomery camp had more responsibilities than the SOE at the Bryan camp and ICC. He simply argues that point in conclusory fashion, and that is not enough to survive summary judgment.

While Hudson undoubtedly feels the pay disparity was unfair, this court offers no opinion in that regard because the evidence falls well short of allowing an inference that the disparity was the result of wrongful discrimination, and that is the only question for the court to address. Therefore, viewing the evidence in the light most favorable to Hudson and drawing all reasonable inferences in his favor, the court concludes that the Bureau is entitled to judgment as a matter of law.

## V.   CONCLUSION

Therefore, it is hereby

ORDERED that the Bureau's motion for summary judgment (Doc. # 26) is granted, and judgment is to be entered in favor of the Bureau.

DONE this 20th day of March 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE